IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| RICHARD W. AMON, JR., an individual, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 8:12CV437 |
| | ) | |
| v. | ) | |
| | ) | |
| UNION PACIFIC DISTRIBUTION | ) | **MEMORANDUM** |
| SERVICES COMPANY, a Delaware | ) | **AND ORDER** |
| corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Defendant Union Pacific Distribution Services Company ("UPDS") terminated the employment of plaintiff Richard W. Amon, Jr. ("Amon") after he refused to report to work for a critical meeting. Amon claims he was terminated because he has a disability in violation of the Americans with Disabilities Act ("ADA")[1] and the Nebraska Fair Employment Practice Act ("NFEPA").[2] Amon also asserts that UPDS refused to grant him leave under the Family Medical Leave Act ("FMLA").[3] UPDS has moved for summary judgment on all of Amon's claims. (Filing 45.) For the reasons that follow, I shall grant UPDS's motion.

---

[1] Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., as amended by the Americans with Disabilities Act Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553.

[2] Nebraska Fair Employment Practice Act, Neb. Rev. Stat. §§ 48–1101, *et. seq*.

[3] Family and Medical Leave Act of 1993, 29 U.S.C. §§ 2601, *et seq*.

# I.  UNDISPUTED MATERIAL FACTS

1.      On December 1, 2004, Amon was hired as an IT Manager by Transentric, the predecessor to UPDS. (Complaint, Filing 1, at CM/ECF p. 2; Filing 62-4, Dep. Richard Amon at CM/ECF p. 34.)  In January 2009, Transentric became UPDS, and Amon was "very much involved" in the transition. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 39-40).

2.      During his employment with UPDS, Amon became a project manager who ensured "process and project management things were being taken care of in an expeditious manner." (Filing 62-4, Dep. Richard Amon, at CM/ECF p. 38.)  Amon's job responsibilities included helping develop and implement technology that would assist UPDS, including serving as a go-between for UPDS in communicating with software developers. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 36-37.)

3.      In or around May 2010, Julia Ulrich began to supervise Amon and was his supervisor at all times relevant to Amon's claims. Among other things, Ulrich was responsible for approving Amon's vacation leave. (Filing 46-2, Decl. Julia Ulrich ¶¶ 4-5.)

4.      Elizabeth Whited was the President of UPDS, and Julia Ulrich reported to Whited at all times relevant to Amon's claims. (Filing 46-3, Decl. Elizabeth Whited ¶ 3.)

## November 2010 Leave of Absence

5.      In November 2010, Amon began experiencing extreme flu-like symptoms, and he was diagnosed with anxiety, depression, and disorientation. (Filing

2

62-4, Dep. Richard Amon, at CM/ECF p. 71.)[4] As a result of this diagnosis, Amon's treating physician recommended that he take short-term disability leave. (Filing 62-4, Dep. Richard Amon, at CM/ECF p. 72.)

6.     UPDS's leave policy required an employee who needs sick leave for more than three days[5] to apply for short-term disability benefits. (Filing 46-4, Decl. Cheri Maxwell ¶ 6; Filing 46-5, UPDS STD Coverage).

7.     UPDS contracts with MetLife to administer its disability benefit plan. (Filing 46-4, Decl. Cheri Maxwell ¶ 7.)  Under this arrangement, UPDS personnel do not administer the disability benefits and receive no information regarding the reason an employee applies for or receives disability benefits. (Filing 46-4, Decl. Cheri Maxwell ¶ 8.)  MetLife only informs UPDS if an employee has qualified or not qualified for the benefits. (Filing 46-4, Decl. Cheri Maxwell ¶ 9.)

8.     In November 2010, Amon's wife contacted Union Pacific healthcare services to notify UPDS that Amon wanted to apply for short-term disability benefits,

---

[4]Plaintiff has submitted a Supplemental Statement of Facts in his Brief in Opposition to Defendant's Motion for Summary Judgment.  (Filing 61, at CM/ECF pp. 6-9.)  Many of these alleged facts describe the nature of Plaintiff's diagnosis and symptoms.  Most of these alleged facts are immaterial because Defendant, for purposes of its Motion for Summary Judgment, "does not argue the issue of whether Amon suffers from a serious health condition" (Filing 66, Def.'s Reply Br. at CM/ECF p. 4 n.3) or "whether Amon has a disability as defined by the ADA."  (Id. at p. 8 n.5.)

[5]UPDS Human Resources Manager Cheri Maxwell stated that UPDS's leave policy required an employee who needs sick leave for more than three days to apply for short-term disability benefits.  However, the policy itself says four days. (Compare Filing 46-4, Decl. Cheri Maxwell ¶ 6 with  Filing 46-5, UPDS STD Coverage).

and UPDS directed her to MetLife. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 72-73.)

9.      MetLife granted Amon short-term disability benefits and informed Cheri Maxwell, the UPDS Human Resources Manager, that Amon qualified for short-term disability leave. Maxwell then informed Ulrich that Amon qualified for short-term benefits, and he was granted a leave of absence. (Filing 46-4, Decl. Cheri Maxwell ¶ 10.)

10.     Amon considered his medical condition in November 2010 and his reason for disability leave confidential, and neither he nor his wife revealed that information to anyone at UPDS. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 73-74.)

## Return from Short-Term Disability Leave

11.     In early December 2010, Amon returned from short-term disability leave to the same position, with the same job duties, and he received the same pay. (Filing 62-4, Dep. Richard Amon, at CM/ECF p. 74.)

12.     Amon admits that he did not experience anything he considered to be retaliation for taking leave in November 2010, and if he would have experienced anything he perceived as retaliation, he would have reported it to Human Resources. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 74-75.)

13.     When Amon returned from leave, UPDS assigned Amon to be the "Project Manager" of the Honda Project, which was an important project because it would bring a new line of business to UPDS from Honda in Mexico. (Filing 46-2, Decl. Julia Ulrich ¶¶ 6-7.) Amon claims that his title was not "Project Manager," but "Facilitator." (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 59-62.)

14.     UPDS described Amon's role in the Honda project as managing the employees working on the project to make sure all of the tasks and deliverables were accomplished. (Filing 46-2, Decl. Julia Ulrich ¶ 8.)  Amon viewed his role at the beginning of the project as ensuring the meetings occurred in an orderly fashion.  He claims he had no real responsibility at this time because the project "was in its infancy," and "it takes a couple of months to develop a project plan with deliverable action items."   However, Amon admits that "[e]very meeting that you go to is important."  (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 68-71.)

15.     Julia Ulrich, Amon's supervisor, "assigned Mr. Amon as the Project Manager because of the importance of the [p]roject and [her] belief that Mr. Amon would be a dedicated project manager who knew all of the requirements to make the project successful." (Filing 46-2, Decl. Julia Ulrich ¶ 9.)

## Vacation Request

16.     In late December 2010, Amon booked a family trip to Hawaii for February 20-27, 2011. (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 92-93 & 96.) Amon requested vacation leave for those dates, and Ulrich approved the leave. (Filing 62-4, Dep. Richard Amon, at CM/ECF p. 96; Filing 46-2, Decl. Julia Ulrich ¶ 10.)

17.     Amon cancelled the Hawaii trip in or around late January 2011 or early February 2011 after he learned his stepdaughter had to undergo surgery. (Filing 62-4, Dep. Richard Amon, at CM/ECF p. 99.)

18.     Amon sent an e-mail to Jessica Kephart, the UPDS Vacation Administrator, cancelling his request for vacation leave. Amon did not provide a reason to Kephart as to why he was cancelling his vacation leave request. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 1-2; Filing 46-6, E-mail Exchange Between Amon and Kephart.)

5

## Week of February 14, 2011

19.     Amon worked a full day on Monday, February 14, 2011, but left work at 12:00 noon on Tuesday, February 15, 2011, to care for his dog and cat because his wife was in Phoenix. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 5-7.)

20.     Amon did not report to his supervisor, Ulrich, that he was leaving early on either of those days, but told his colleague Sam Packard ("Packard"). Amon testified that this was the "normal practice," and he was not required to report leaving early from work directly to Ulrich. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 6-8.)

21.     Amon notified UPDS that he was taking a sick day on Wednesday, February 16, 2011, by sending an e-mail from his personal e-mail account at 6:41 a.m. to Packard with the subject line, "taking a sick day today." (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 8-10; Filing 46-7, E-mail from Amon to Packard.)

22.     As with leaving work early, Amon claims the "standard procedure" if he was taking sick leave was to send an e-mail to Packard, and Packard would inform Ulrich so he did not have to send an e-mail directly to Ulrich. Packard did the same. (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 8.)

23.     At 10:21 a.m. on Wednesday, February 16, 2011, Ulrich sent an e-mail to Amon's work e-mail address with the subject line, "Where are you" (Filing 46-2, Decl. Julia Ulrich ¶ 12; Filing 46-9, E-mail String dated Feb. 16, 2011, through Feb. 23, 2011.)  Amon did not respond to this e-mail and claims he never received it. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 16-17.)

24.     Ulrich sent this e-mail because she was skeptical that Amon was sick and believed that he may have decided to take the vacation for which he requested leave and later cancelled. (Filing 46-2, Decl. Julia Ulrich ¶ 13.)

6

25.     Amon notified UPDS that he was taking a sick day on Thursday, February 17, 2011, by sending an e-mail at 6:03 a.m. that day to Packard and Ulrich from his personal e-mail account stating, "still running to the bathroom. I will be working from home, when I can." (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 11-12; Filing 46-9, at CM/ECF p. 1.)

26.     At 3:03 p.m. on that same day, Ulrich sent an e-mail to Amon's work e-mail address with the subject line, "Honda meeting." In the e-mail, Ulrich stated, "What's the message for Beth tomorrow?" (Filing 46-9, at CM/ECF p. 1.)

27.     Amon was the facilitator for the Honda meeting to which Ulrich was referring, and it was set up by Amon. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 21-22, 24.)

28.     Ulrich and Whited considered the Honda meeting "critical" to the project. (Filing 46-2, Decl. Julia Ulrich ¶ 18; Filing 46-3, Decl. Elizabeth Whited ¶¶ 8-9, 11, 13, 16.) "Mr. Amon was the only one who had the knowledge of what had to happen for this particular project plan. He had the project plan. He had the file. He knew what needed to be done. There wasn't anybody else that could easily assume that work and step right in with no notice." (Filing 64-2, Dep. Julia Ulrich at CM/ECF p. 23.)

29.     Amon did not respond to this e-mail and claims he never received it because it was sent to his work e-mail despite the fact that he informed Ulrich in his e-mail that he would be working from home when he could. (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 17.)

30.     On Friday, February 18, 2011, at 7:29 a.m., Amon sent an e-mail from his personal e-mail account to Packard and Ulrich with the subject line, "I am taking a vacation day." In the body of the e-mail, Amon stated, "It is not HI but NE, but I will take it." (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 14-15, 18; Filing 46-9

7

at CM/ECF p. 2.)  Amon claims he was actually sick on Friday, February 18, 2011, but he did not want to request a sick day because he "knew if [he] took three sick days in a row [he] would have to start the short-term disability process all over again, and [he] wanted to continue to work." (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 15.)

31.    At 7:41 a.m. that same day, Ulrich sent an e-mail reply to Amon's personal e-mail account stating, "What is your plan for the Honda update this morning? Progress on this project is critical." (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 18; Filing 46-9 at CM/ECF p. 2.)  Amon admits that he received this e-mail, but claims he did not respond to it because he was sick and "probably in bed" when the e-mail was sent. (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 18.)

32.    Ulrich then spoke with Whited regarding the importance of the Honda meeting and the fact that Amon had not requested vacation leave until that morning. (Filing 46-2, Decl. Julia Ulrich ¶ 23; Filing 46-3, Decl. Elizabeth Whited ¶ 9.)

33.    Packard pointed out to Ulrich that two of Amon's e-mails contained a time stamp of "5:29 AM PST." (Filing 46-2, Decl. Julia Ulrich ¶ 22; Filing 46-9 at CM/ECF pp. 1-2.)  Ulrich also informed Whited of the "PST" time stamp, and both believed Amon may have been in Phoenix with his family and not in Omaha. (Filing 46-2, Decl. Julia Ulrich ¶ 24; Filing 46-3, Decl. Elizabeth Whited ¶ 10.)  Amon cannot explain the Pacific Standard Time stamp on the e-mails, but he claims it was he—not his wife, who was in Phoenix—who sent the e-mails from his account that morning. (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 21.)

34.    Whited and Ulrich then decided that the Honda meeting was too important for Amon to miss, and if he was in Omaha, he must report to work. (Filing 46-2, Decl. Julia Ulrich ¶ 25; Filing 46-3, Decl. Elizabeth Whited ¶ 11.)

35.    At 8:02 a.m. on Friday, February 18, 2011, Ulrich sent Amon an e-mail to his personal e-mail address, stating:

> Your vacation will not be approved. It was not planned or approved in advance and there is a critical business meeting this morning that you were expected to lead. You need to report to work today in time for the Honda meeting (9:00 am) or work through Met Life's STD process before returning to work. Please work with Cheri [Maxwell] or the HR Service Center if you have questions on the STD process.

(Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 24-25; Filing 46-9 at CM/ECF p. 2.) Amon received this e-mail, but he did not respond to it because he believed there was no need to do so.  He believed he was to "[e]ither show up to work or apply for short-term disability." (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 25.)

36.    Amon called his wife in Phoenix at 8:27 a.m., telling her he was not feeling well and that he needed an appointment with his psychiatrist.  (Filing 62-2, Aff. Patricia Amon ¶ 5.) Mrs. Amon contacted the psychiatrist that day and scheduled the first-available appointment for her husband, which was the following Wednesday, February 23, 2011.  (Filing 62-2, Aff. Patricia Amon ¶¶ 6-7.)

37.    Later that day, Ulrich directed Human Resources Manager Cheri Maxwell to call Amon to determine why he was refusing to report to work. (Filing 46-2, Decl. Julia Ulrich ¶ 28; Filing 46-4, Decl. Cheri Maxwell ¶ 11.)

38.    Maxwell recalls that at 11:30 a.m. on Friday, February 18, 2011, she called Amon at home and asked him if he was sick, and Amon replied, "no, I'm fine." Maxwell claims she then asked, "are you sure, is everything okay," and Amon responded, "yes, I'm fine." Amon told Maxwell that he did not need to utilize short-term disability. (Filing 64-1, Dep. Cheri Maxwell at CM/ECF pp. 27-29.) Amon does not recall telling Maxwell that he did not need a sick day and that he was taking

a vacation day instead, but "it could have happened."  (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 27.)

39.    Maxwell then met with Ulrich and Whited to report what she had learned from Amon, and Ulrich and Whited directed Maxwell to call Amon again and tell him to report to work for the critical meeting. Maxwell called Amon again and informed him that his vacation request was not approved, and that Whited and Ulrich directed him to report to work by 3:00 p.m. Amon stated that asking him to report to work by 3:00 p.m. was unreasonable because it was too soon, so Maxwell asked him to report by 5:00 p.m. (Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 28.)  In response, Amon stated to Maxwell that he could report to work by 5:00 p.m., but he would not, adding, "It's a matter of principle and there's nothing wrong, not a darn thing is wrong." (Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 28.)

40.    Amon does not recall this conversation, but he admits it "could have" occurred.  (Filing 62-5, Dep. Richard Amon at CM/ECF p. 28.)

41.    Although Amon does not "recall a whole lot of that day," he claims he told Maxwell that he "wasn't sick with the flu" and that he wanted to "set up something to talk with her about [his] condition."[6] Amon did not tell Maxwell the nature of his "condition," and he told no one at UPDS that he was suffering from

---

[6]Amon claims he told Maxwell that he "wanted to come in the next week and discuss with her what's been going on with my sickness for the previous three days." (Filing 62-5, Dep. Richard Amon at CM/ECF p. 27.)  Maxwell disagrees. "[H]e may have asked if he could talk to me next week, but not—he did not mention it was about why he was gone."  (Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 27.)  Even if Amon did mention that he wanted to meet with Maxwell to discuss "what's been going on with my sickness for the previous three days," the person who decided to terminate Amon's employment, Elizabeth Whited, testified that Maxwell did not communicate to her that Amon "had requested to come in and meet with her to discuss his absence."  (Filing 64-3, Dep. Elizabeth Whited at CM/ECF p. 16.)

10

anxiety or any other condition for which he needed sick leave or any other accommodation. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 27-29.)

42. After the phone call, Ulrich, Whited, and Maxwell then discussed Amon's response to Maxwell, and Whited made the decision to terminate Amon's employment for insubordination and refusing to report to work for the critical Honda meeting for which he was the facilitator. (Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 30; Filing 46-2, Decl. Julia Ulrich ¶ 33; Filing 46-3, Decl. Elizabeth Whited ¶ 16.)

43. Whited then directed Maxwell to call Amon and inform him his employment was terminated for refusing to report to work. (Filing 46-4, Decl. Cheri Maxwell ¶ 23; Filing 46-3, Decl. Elizabeth Whited ¶ 17.)

44. At 4:09 p.m. and again at 4:36 p.m. that day, Maxwell called Amon and left a message to call her before reporting to work. (Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 30; Filing 46-11, Timeline.) Amon does not "recall any of that." (Filing 62-5, Dep. Richard Amon at CM/ECF p. 128.) Amon recalls having only one conversation with Maxwell on Friday, February 18, 2011, because he was "disoriented that entire day." (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 28-30.)

45. On Monday, February 21, 2011, President's Day, a holiday on which UPDS employees did not need to report to work, Maxwell called Amon again because Amon had not returned her calls from Friday. Maxwell informed Amon during this telephone conversation that UPDS was terminating his employment for insubordination for refusing to report to work on Friday, February 18, 2011. Maxwell then asked if Amon had any questions, to which he replied, "no," and hung up the telephone. (Filing 64-1, Dep. Cheri Maxwell at CM/ECF pp. 31-32.)

46. Amon recalls receiving a telephone call regarding his termination, but does not recall exactly when he received the phone call or from whom. Amon recalls

that the call came "during the weekend, whether it was Sunday or Monday." (Filing 62-5, Dep. Richard Amon at CM/ECF p. 29.)

47.     On February 22, 2011, UPDS sent Amon an e-mail and letter formally terminating his employment as of February 21, 2011. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 45-46; Filing 46-12, Termination E-Mail; Filing 46-13, Termination Letter.)

48.     In response to the e-mail, Amon requested information regarding short-term disability benefits and an explanation for his termination. Maxwell responded by e-mail, providing Amon the information and encouraging him to apply. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 45-48.)

49.     Because Amon was incapacitated, Amon's wife called MetLife Insurance Company on his behalf to make a claim for short-term disability benefits. She telephoned MetLife Insurance Company twice, once on February 21, 2011, and once on February 22, 2011. She was told by MetLife that they would send documentation to the psychiatrist's office for the appointment on February 23, 2011. (Filing 62-2, Aff. Patricia Amon ¶ 8.)

50.     Mrs. Amon did not call MetLife Insurance Company prior to February 21, 2011, because she was taking care of her husband, who was very ill, and because it was the weekend. Additionally, it was her understanding that making an appointment with her husband's physician was the first step in the short-term disability process.  (Filing 62-2, Aff. Patricia Amon ¶ 9.)

51.     Despite the fact that he was terminated, Amon applied for short-term disability benefits and sent an e-mail dated February 22, 2011, to Ulrich stating, "Per your recommendation below, I am working with Met Life on the STD process." (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 36-38; Filing 46-9 at CM/ECF p. 3.)  Amon claims he actually started the short-term disability process on February 18,

2011, when his wife made an appointment for Amon with his psychiatrist for the following Wednesday.  (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 31-32; Filing 62-2, Aff. Patricia Amon ¶¶ 6-8.)

52.   UPDS then sent an e-mail to MetLife notifying the case manager that Amon's employment was terminated and his last day of employment was February 21, 2011. The e-mail also noted that it appeared Amon reported a claim on the same day as his termination, so pursuant to the UPDS STD plan, he was not eligible for benefits beyond February 21, 2011. (Filing 46-4, Decl. Cheri Maxwell ¶ 29; Filing 46-14, E-mail from Jack Sullivan to Met Life dated Feb. 23, 2011.)

## Reasonable Accommodation

53.   Amon admits he had Equal Employment Opportunity training, but he testified he may have been distracted, and he does not recall whether he paid attention to the training. (Filing 62-5, Dep. Richard Amon at CM/ECF p. 66.)

54.   UPDS had a reasonable accommodation policy in place in February 2011. (Filing 46-4, Decl. Cheri Maxwell ¶ 30; Filing 46-16, UPDS FMLA Policy.) The policy allowed an employee to request an accommodation at any time, orally or in writing, to the EEO Hotline. (Filing 46-17.)

55.   While Ulrich, Maxwell, and Whited were all aware that Amon had taken short-term disability leave in the past, Amon has not presented evidence that anyone at UPDS had knowledge of the existence of, or the nature of, his alleged disability. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 62-65; Filing 64-3, Dep. Elizabeth Whited at CM/ECF pp. 16-17; Filing 64-1, Dep. Cheri Maxwell at CM/ECF p. 20; Filing 64-2, Dep. Julia Ulrich at CM/ECF p. 32.)

56.   Other than requesting sick leave for February 16 and 17, 2011, and referring to a "condition" in a telephone conversation with Maxwell, there is no

13

evidence that Amon told Maxwell he wanted to speak with her regarding a reasonable accommodation. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 89-90.)

## FMLA

57.     UPDS had an FMLA policy in place in February 2011. (Filing 46-4, Decl. Cheri Maxwell ¶ 31; Filing 46-16, UPDS FMLA Policy.)

58.     Despite using FMLA in November 2010, Amon testified that he was unaware of the FMLA policy, but he knew that UPDS kept all of its policies online. (Filing 62-5, Dep. Richard Amon at CM/ECF pp. 49-51.)  Amon admits that he never requested FMLA leave. (Filing 62-5, Dep. Richard Amon at CM/ECF p. 48.)

59.     When an employee requests disability leave at UPDS, that request is tantamount to making an FMLA request, and the employee need not make a separate request for FMLA leave because FMLA leave runs concurrently with the employee's short-term disability benefits.  (Filing 64-1, Dep. Cheri Maxwell at CM/ECF pp. 17-18.)

## II.  STANDARD OF REVIEW

"'Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).  After the movant has demonstrated the absence of a genuine issue of material fact, the nonmovant must respond by submitting evidence that sets out specific facts showing that there is a genuine issue for trial.  *Id*.  In doing so, the nonmovant must substantiate her allegations with "'sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy.'"  *Moody v. St. Charles*

*Cnty.*, 23 F.3d 1410, 1412 (8th Cir. 1994) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992)). "A mere scintilla of evidence is insufficient to avoid summary judgment." *Id.* "The basic inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Diesel Mach., Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and citations omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Jackson*, 643 F.3d at 1085 (quoting *Torgerson*, 643 F.3d at 1042).

## III.  DISCUSSION

### A.  ADA Claim

Amon first asserts a disability discrimination claim under the ADA and section 48-1104 of the Nebraska Fair Employment Practice Act,[7] claiming that (1) UPDS terminated Amon's employment because of his disability and (2) UPDS failed to provide a reasonable accommodation for Amon's disability. (Filing 1, Complaint ¶¶ 20-30.)

### 1.  ADA Discrimination

"To establish discrimination under the ADA, an employee must show that [he or] she (1) is disabled within the meaning of the ADA, (2) is a qualified individual under the ADA, and (3) has suffered an adverse employment action because of [his or] her disability." *Hill v. Walker*, 737 F.3d 1209, 1216 (8th Cir. 2013). "Once the

---

[7]Because disability discrimination claims under the NFEPA are analyzed using the same framework as claims brought under the ADA, *see Orr v. Wal–Mart Stores, Inc.*, 297 F.3d 720, 723 (8th Cir. 2002), no separate analysis of Amon's state-law claim is necessary.

plaintiff establishes this prima facie case, then a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. If such reason is provided, the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (internal citations omitted).

Assuming for purposes of the defendant's summary judgment motion that Amon has established the first two elements of his discrimination claim, he has failed to establish the third. Amon has presented no evidence that anyone at UPDS was aware of his condition such that the termination of his employment could have been related to his disability. There is no evidence that UPDS knew why Amon had previously taken short-term disability leave or that UPDS was aware of Amon's mental condition. (Filing 62-5, Dep. Richard Amon, at CM/ECF pp. 63-65 (Plaintiff stating he has no evidence that anyone in the UPDS Human Resources Department or the person who decided to terminate his employment knew of his diagnosis); *id.* at CM/ECF pp. 57 & 73-74 (Plaintiff stating he "never talked with anybody at UPDS about my short-term disability. It was confidential, so the topic never came up.").

Furthermore, there is no evidence that UPDS even knew that Amon was ill on Friday, February 18, as he advised his boss and co-worker by e-mail that morning that "I am taking a vacation day . . . It is not [Hawaii] but [Nebraska], but I will take it." (Filing 46-9 at CM/ECF p. 2.) Amon admits that on Friday, February 18, he did not tell co-worker Sam Packard, his boss Julia Ulrich, or HR manager Cheri Maxwell that he was suffering from recurring symptoms of depression, anxiety, and mood disorder. (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 32.)

Amon's conduct on February 18, 2011, of requesting a vacation day early in the morning for that same day, telling his employer that he was not sick, and nonetheless refusing to report to work after his vacation request was denied, did not put UPDS on notice that he had a disability such that there could be a causal link between UPDS's

16

decision to terminate Amon's employment and his alleged disability. Even assuming, as Amon suggests, that during one of Amon's telephone conversations with Maxwell on February 18 Amon mentioned to Maxwell that he wanted to meet with her to discuss "what's been going on with my sickness for the previous three days," the person who decided to terminate Amon's employment, UPDS President Elizabeth Whited, testified that Maxwell did not communicate to her that Amon "had requested to come in and meet with her to discuss his absence." (Filing 64-3, Dep. Elizabeth Whited at CM/ECF p. 16.) Amon has presented no evidence to the contrary.

Even if Amon was able to establish a prima facie case of discrimination, UPDS had a legitimate, non-discriminatory reason for terminating his employment—that is, Amon refused to report to work after his supervisor notified him that his request for vacation had been denied because his attendance at the Honda meeting was critical. Amon appears to argue that UPDS mistakenly believed Amon was insubordinate because he actually was suffering from anxiety or a mood disorder which prohibited him from reporting to work. However, "'[t]he critical inquiry . . . is not whether [Amon] actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that [he] was guilty of the conduct justifying discharge.'" *Moody v. Vozel*, 771 F.3d 1093, 1097 (8th Cir. 2014) (quoting *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 861-62 (8th Cir. 2009)); *Pulczinski v. Trinity Structural Towers*, Inc., 691 F.3d 996, 1002 (8th Cir. 2012) (same); *see also* *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769-70 (8th Cir. 2008) (affirming summary judgment on ADA claim where employer honestly believed employee had been sleeping on the job in violation of company policy); *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000) (affirming summary judgment where employee failed to rebut employer's honest belief that employee, who had previously been disciplined, had taken an unauthorized break).

"An employee can prove that [his] employer's articulated justification for an adverse employment action is pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing

17

that the employer's proffered explanation is unworthy of credence." *Pye v. Nu Aire Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011) (internal quotation marks and citation omitted). "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id.* (internal quotation marks and citation omitted).

There is simply no evidence that UPDS terminated Amon's employment for a discriminatory reason or that UPDS's belief that Amon was insubordinate should not be believed. It is undisputed that Amon requested a vacation day on the same day he was to take it and on the same day as a critical work meeting that he was expected to lead, and that he informed Maxwell that he was not sick. It is undisputed that Amon did not report to work despite directions to do so. Moreover, Amon admits that he has no evidence that Ulrich, Maxwell, or Whited—who as President of UPDS made the decision to terminate his employment—had any knowledge of Amon's alleged disability. There is simply no evidence in the record that UPDS's reason for terminating Amon's employment was false or motivated by Amon's disability.

To the extent Amon attempts to show pretext by establishing that UPDS failed to follow its own termination policies—that is, not following a "progressive discipline" model—Amon also fails. *See E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d at 970. "The parties do not advance any written provision indicative of an established policy or procedure for employee discipline or termination." *Id.* Further, the fact that other employees may have received warnings before termination "without more, does not indicate that the company had an established policy." *Id.* at 971.

## 2.  ADA Reasonable Accommodation

The "discrimination" in an ADA reasonable accommodation claim is "framed in terms of the failure to fulfill an affirmative duty—the failure to reasonably accommodate the disabled individual's limitations, as required by the ADA. In order to determine whether an accommodation is necessary, and if so, what that

accommodation may be, the employer and employee must engage in the interactive process." *E.E.O.C. v. Product Fabricators, Inc.*, 763 F.3d at 971 (internal quotation marks and citations omitted).

> To show that the employer failed to participate in the interactive process, the employee must show:  1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Id.* (internal quotation marks and citations omitted).

"While the interactive process is informal and flexible, the predicate requirement triggering the interactive process is the employee's request for the accommodation." *Id.*  An employer has "no duty to accommodate" when the plaintiff has "failed as a matter of law to provide sufficient notice of [his] need." *Rask v. Fresenius Med. Care North America*, 509 F.3d 466, 470 (8th Cir. 2007). "The standard is clear: Where, as here, the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer, as is often the case when mental disabilities are involved, the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Id.* (internal quotation marks and citation omitted).

As discussed above, there is no evidence that anyone at UPDS knew about Amon's alleged disability.  Further, Amon admits that he did not request a reasonable accommodation or assistance through UPDS's formal process or by making a request orally or in writing to any UPDS manager.  It is undisputed that Amon requested vacation leave on Friday, February 18, 2011, and when confronted by Maxwell over the telephone, he stated he was not sick. Amon explained in his deposition that he did

not want to take sick leave because he "knew that if [he] took three sick days in a row [he] would have to start the short-term disability process all over again, and [he] wanted to continue to work." (Filing 62-5, Dep. Richard Amon at CM/ECF p. 15.) Amon claims that despite the fact he told Maxwell he was not sick, he did tell her that he would like to come in the following week and discuss "his condition." Even assuming Amon made such a statement, such a cryptic reference is insufficient under the circumstances to say UPDS knew about Amon's disability, its limitations, and his desire for an accommodation. *Rask*, 509 F.3d at 470.

Accordingly, the defendant's motion for summary judgment shall be granted with regard to Amon's ADA discrimination and reasonable accommodation claims.

## B. FMLA Claim

### 1. Interference/Entitlement

Amon alleges that UPDS "interfered"[8] with his rights under the FMLA.[9] (Filing 1, Complaint ¶ 36.)  In order to establish a claim for interference (or entitlement) under the FMLA, Amon must show that he gave notice of his need for FMLA leave. *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008).

---

[8]The Eighth Circuit Court of Appeals has recently begun to describe this type of claim as an "entitlement" claim; that is, "an employee claims the denial of a benefit to which he is entitled under the statute." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012).

[9]While Amon's complaint alleges FMLA claims related to his wife and daughter (Filing 1, Complaint ¶¶ 33, 34), Amon has abandoned those claims in his brief in opposition to the defendant's motion for summary judgment. (Filing 61 at CM/ECF p. 11 n.1.)

"An employee must do more than merely call in sick to trigger an employer's duties under the FMLA." *Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 785-86 (8th Cir. 2009). The FMLA requires that an employee provide his employer with "enough information to show that []he may need FMLA leave. While the employee is not required to invoke the FMLA by name, the employee must provide information to suggest that [his] health condition could be serious." *Murphy v. FedEx LTL, Inc.*, 618 F.3d 893, 903 (8th Cir. 2010) (internal citation and quotation marks omitted). "To permit otherwise would enable an employee to blind-side [his] employer by taking a generic leave request and retroactively transforming it into an FMLA claim." *Id.* at 900.

> The employer must be made aware that the absence is due to a serious illness so the employer can distinguish it from ordinary sick-days, or even malingering, as a type of unusual and privileged absence. To hold otherwise would create an unreasonable burden for employers, requiring them to investigate virtually every absence to ensure that it does not qualify for FMLA leave.

*Scobey*, 580 F.3d at 786 (internal citations and quotation marks omitted). Although the sufficiency of an employee's notice requires considering the totality of the circumstances and is often a jury question, notice can be insufficient as a matter of law. *Id.*

In Amon's case, and as described above, there is no evidence that UPDS knew why Amon had previously taken short-term disability leave, that UPDS was aware of Amon's mental condition, or that UPDS knew that Amon was ill on Friday, February 18. It is also undisputed that on the day UPDS President Elizabeth Whited decided to terminate Amon's employment, Amon did not tell Whited, co-worker Sam Packard, his boss Julia Ulrich, or HR manager Cheri Maxwell that he was suffering from recurring symptoms of depression, anxiety, and mood disorder.

Amon claims that when he spoke to Cheri Maxwell on Friday, February 18, he said, "I am not sick," by which Amon says he meant, "I do not have the flu, but I wanted to talk with her about my condition." (Filing 62-5, Dep. Richard Amon, at CM/ECF p. 86.) Amon testified by deposition that he told Maxwell, "I have a condition that I want to discuss with you face to face, and I'd rather not talk about it on the phone. I said I wasn't sick with the flu. . . . I told Cheri Maxwell, when I come in the morning, early in the week, that I'd like to sit down and talk with her." (Filing 62-4, Dep. Richard Amon, at CM/ECF pp. 78.)

Even if Amon did mention to Maxwell a "condition" about which he would "like to sit down and talk with her," he affirmatively indicated to her and other UPDS employees that he was not sick and that he was taking a vacation day. "[E]ven if [I] assume, for purposes of summary judgment, that [Amon's] remark [on February 18 that he had a "condition"] constituted sufficient notice that [Amon] might need some time off in the future for treatment for . . . depression, that remark did not alter the fact that [Amon's] immediately preceding absences were not, and did not appear to [UPDS] to be, protected by the FMLA." *Scobey*, 580 F.3d at 789.

Therefore, having considered the totality of the circumstances in the light most favorable to the plaintiff, I conclude there is no genuine issue of material fact that Amon did not adequately put UPDS on notice that he might be entitled to leave under the FMLA, and the defendant's motion for summary judgment on Amon's FMLA interference (or entitlement) claim shall be granted. *See Murphy*, 618 F.3d at 903 ("By itself, Murphy's request for thirty days' leave to 'take care of things' would be insufficient."); *Scobey*, 580 F.3d at 787-90 (plaintiff failed to provide sufficient notice under FMLA when there was no evidence that employer had prior knowledge of plaintiff's alcohol problem and plaintiff's statements to employer only indicated that plaintiff was upset and intoxicated); *Rask*, 509 F.3d at 472-73 (employee's notice to employer that she had been diagnosed with "depression," with no accompanying details, was insufficient as a matter of law); *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 992-93 (8th Cir. 2005) (doctor's notes stating that an employee should not

22

work, but offering no diagnosis or other detail, did not provide employer with sufficient notice); *Carter v. Ford Motor Co.*, 121 F.3d 1146, 1148 (8th Cir. 1997) (notification that employee is "sick," without more, is insufficient notice).

## 2.  Retaliation/Discrimination

Amon also asserts a claim for what he calls FMLA "retaliation" (now characterized by the Eighth Circuit Court of Appeals as "discrimination"), *see Pulczinski, 691 F.3d at 1006*, by contending that (1) UPDS terminated Amon's employment on a holiday (Monday, February 21) to prevent him from applying for short-term disability and FMLA benefits on Tuesday, February 22; and (2) because MetLife retroactively approved Amon's request for short-term disability and FMLA leave to cover the three days he was ill, Amon was "technically" on short-term disability and FMLA leave when he was terminated. (Filing 61, Pl's Br. Opp'n Def's Mot. Summ. J. at CM/ECF pp. 16-18.)

To prevail on this claim, and using the familiar *McDonnell Douglas* burden-shifting framework, Amon must prove "(1) that he engaged in activity protected under the Act, (2) that he suffered a materially adverse employment action, and (3) that a causal connection existed between the employee's action and the adverse employment action." *Pulczinski, 691 F.3d at 1007*.

There is no evidence that the decision-maker, Elizabeth Whited, was aware that Amon had sought disability benefits (and FMLA benefits by virtue of the disability application) at the time of the adverse employment action. *See e.g., Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006) (plaintiff could not show causation in prima facie case of retaliation because none of the members of the hiring committee knew about plaintiff's protected activity).  The evidence indicates that Whited made the decision to terminate Amon's employment on February 18, 2011, after he refused to report to work—three days before Amon was "technically" on FMLA leave.  Even if the decision to terminate Amon's employment was made on February 21, 2011, there

23

is no evidence that Whited or any other UPDS employee was aware that Amon sought short-term disability benefits until Amon sent an e-mail to Julia Ulrich on February 22, 2011, stating, "Per your recommendation below, I am working with Met Life on the STD process." Because Amon is unable to establish that UPDS was aware he was engaged in a protected activity before he was terminated, he has failed to prove a causal connection between his termination and his protected activity.

Even if Amon could establish a prima facie case of FMLA discrimination, UPDS has established a legitimate nondiscriminatory reason for its action in terminating Amon's employment—it believed Amon was insubordinate when he requested a vacation day and refused to report to work after his supervisor notified him the request for vacation was denied—and Amon has presented insufficient evidence to show that this explanation was pretextual.

Accordingly, the defendant's motion for summary judgment shall also be granted with regard to Amon's FMLA retaliation/discrimination claim.

IT IS ORDERED:

1.     Plaintiff's Motion to Restrict Access (Filing 60) to the evidence and pleadings Plaintiff filed in support of Plaintiff's Brief in Opposition of Defendant's Motion for Summary Judgment in order to prevent disclosure of Plaintiff's confidential medical records is granted;

2.     Defendant's Motion for Summary Judgment (Filing 45) is granted as to all of Plaintiff's claims; and

3.     Judgment shall be entered by separate document.

DATED this 26th day of March, 2015.

24

BY THE COURT:

*Richard G. Kopf*

Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.